IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RANDY LEE LUCAS,                    )
AIS #169036,                       )
                                   )
          Plaintiff,               )
                                   )
     v.                            )          CASE NO. 2:09-CV-115-TMH
                                   )                  [WO]
                                   )
PRISON HEALTH SERVICES, INC.,      )
et al.,                            )
                                   )
          Defendants.              )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Randy Lee

Lucas ["Lucas"], a state inmate, challenging the medical treatment provided to him at the

Ventress Correctional Facility ["Ventress"] from March 20, 2007 until March 30, 2007, for

a fracture of his left hip.  *Complaint - Doc. No. 1* at 2.  Specifically, Lucas complains that

the defendants failed to diagnose his injury properly when he first reported to the health

care unit which caused a delay in his receipt of appropriate medical treatment.  *Id*. at 2-3.

Lucas also alleges that the defendants failed to provide appropriate post-operative

treatment for pain in his left knee and hip.  *Id*. at 6.  Lucas names Prison Health Services,

Inc. ["PHS"], the health care provider for the state prison system during the relevant time

period and Dr. John Peasant and nurse Johnson, both employees of PHS at Ventress as

defendants in this cause of action. Lucas seeks monetary damages for the alleged violations of his constitutional rights. *Id*. at 4.

The defendants filed a special report and relevant supporting evidentiary materials, including affidavits and medical records, addressing Lucas' claims for relief. Pursuant to the orders entered in this case, the court deems it appropriate to construe this report as a motion for summary judgment. *Order of May 27, 2009 - Doc. No. 18*. Thus, this case is now pending on the defendants' motion for summary judgment. Upon consideration of this motion, the evidentiary materials filed in support thereof and the plaintiff's response to the motion, the court concludes the defendants' motion for summary judgment is due to be granted.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered

---

[1] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."  *Id*. "'Shall' is also restored to express the direction to grant summary judgment."  *Id*. Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

undisputed -- show that the movant is entitled to it."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison [medical personnel]. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted). Consequently, to survive the defendants' properly supported motion for summary judgment, Lucas is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment.

*Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of*

5

*the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine dispute of material fact, nonmoving party must produce evidence such that reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts,

a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Lucas fails to demonstrate a genuine dispute of material fact in order to preclude summary judgment. *Matsushita*, *supra*.

## III. DISCUSSION

### A. Absolute Immunity

With respect to any claims Lucas lodges against the defendants in their official capacities, they are entitled to absolute immunity from monetary damages. Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his [or her] official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419,

1429 (11ᵗʰ Cir. 1997).

In light of the foregoing, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11ᵗʰ Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11ᵗʰ Cir. 1989).

## B.  Uncontested Material Facts

On March 20, 2007, Lucas suffered an injury to his left hip when another inmate knocked him to the ground. *Complaint - Doc. No. 1* at 5 ("I was ran into by another inmate next to the Volleyball Court, I hit the ground and there was a snapping sound and extreme pain in my [left] knee and hip."). A correctional officer reported this incident to the health care unit, after which a member of the medical staff, identified by Lucas as nurse Johnson, arrived in a golf cart and transported Lucas to the health care unit for examination. *Id.*

Upon his arrival at the health care unit, Lucas reported he "was standing on the sideline on the volleyball court and a guy ... running to stop the ball ... ran into me and I went flying." *Defendants' Exhibit B (Medical Records of Randy Lucas - Part 5) - Doc. No. 14-6* at 1. Nurse J. Smith examined Lucas and observed that he "was ... unable to stand @ this time. [Complains of] severe pain on movement. No noted bruises, swelling or broken skin. Color normal. Breathing regular and unlabored. Alert & responsive. [Well] oriented.... He states that he landed on his [left] hip. [After approximately thirty minutes, inmate Lucas] is beginning to move his hip and leg [with] some ease. Dr. Peasant was

8

notified [of inmate's injury and the attending nurse's evaluation].  He ordered to place inmate in infirmary [for observation and prescribed 600 mg of Motrin every six hours to alleviate inmate's pain].  To be seen [by Dr. Peasant] in a.m." *Id*.  Medical personnel acted in accordance with these orders.

During his overnight stay in the infirmary, the on-duty nurse checked Lucas' condition approximately every two hours.  *Defendants' Exhibit B (Medical Records of Randy Lucas - Part 4) - Doc. No. 14-5* at 146.  At 1:00 a.m. on March 21, 2007, Lucas informed the nurse that his pain registered a six out of ten on the pain scale; a couple of hours later the attending nurse noted Lucas was "resting quietly"; and at 5:30 a.m. Lucas advised the nurse that his pain had gotten better.  *Id*.  Nurse Johnson came on duty and examined Lucas at approximately 7:00 a.m.  *Id*.  Pursuant to Lucas' request and in accordance with the prescription, she provided Lucas 600 mg of Motrin.  *Id*.  At 10:00 a.m., Nurse Johnson observed Lucas sitting on his bedside and noted he "offer[ed] no" complaints. *Id*. at 145. Nurse Johnson continued to monitor Lucas' condition in compliance with the physician's orders.

Dr. Peasant conducted his scheduled examination of Lucas for evaluation of the left hip injury.  *Id*. at 122.  During this examination, Dr. Peasant observed that Lucas walked with a limp and determined that Lucas suffered a decreased range of motion in his left hip.  *Id*.  Lucas advised Dr. Peasant he contracted Legg-Calve-Perthes disease in his left hip as

a young child.  *Id*.[2]  Based on his personal examination of Lucas and the medical history associated with the inmate, Dr. Peasant diagnosed Lucas with a contusion of his left hip joint and associated pain.  *Id*.  Dr. Peasant prescribed medication to alleviate Lucas' pain, – i.e., 600 mg Motrin four times a day for 30 days, issued crutches to Lucas to aid his mobility and lessen stress on the hip, ordered Lucas to remain in bed for three days, and restricted his movement by prohibiting standing or walking for more than five minutes. *Id*. at 56, 122, 147.  Dr. Peasant scheduled a follow-up appointment with Lucas for March 27, 2007.

Lucas reported to the health care unit on March 27, 2007, as scheduled for evaluation by Dr. Peasant. Dr. Peasant again observed that Lucas exhibited signs of pain in his left hip, walked with a limp, and demonstrated a limited range of motion in this hip. *Defendants' Exhibit B (Medical Records of Randy Lucas - Part 4) - Doc. No. 14-5* at 122. Dr. Peasant ordered immediate x-rays of Lucas' left hip and pelvis.  *Id*. at 122, 147.  He also ordered Lucas to remain in bed for two days.  *Id*. at 147.  After reviewing the x-rays, Dr. Peasant scheduled Lucas for an appointment on March 29, 2007, with a free-world orthopedic surgeon, Dr. Tai Q. Chung, for further evaluation of his left hip and knee.

Dr. Chung examined Lucas and performed various radiological tests which indicated

_____

[2]Legg-Calve-Perthes Disease ["LCPD" or "Perthes"] is a rare childhood hip disorder most often found in boys between the ages of 2 and 12. LCPD adversely affects the top of the long bone inside the hip socket – i.e., the femoral epiphysis. In individuals who suffer from this condition, the blood supply to the hip bone gets interrupted, which causes the bone tissue to die and collapse. Although the bone may break across the top, the blood supply will return and the bone will regrow. This process, however, could result in long-term problems with the affected hip.

"an almost undisplaced fracture of the left femoral neck....  Medical history is remarkable for Legg-Perthes disease at 5-6 years of age." *Defendants' Exhibit B (Medical Records of Randy Lucas - Part 4) - Doc. No. 14-5* at 71.  Dr. Chung admitted Lucas to Baptist Medical Center ["Baptist"] for "reduction and fixation [of the left hip femoral neck fracture] to restore him to his previous status as much as possible.  It is understood that he does not have a good femoral head, but if his femoral neck heals, at least he can go back to his previous functional status...." *Id.* Dr. Chung explained that the March 30, 2007, surgical procedure performed on Lucas' "minimally displaced left femoral neck fracture" as follows:

> With the patient under satisfactory general anesthesia on the fracture table, with the left leg extended and the right leg flexed at the hip and the knee. The left hip and leg were prepped with Betadine and draped sterilely in the usual fashion. The fractures were gently reduced with traction. There is a slight internal rotation. The C-arm image intensifier were used to verify good reduction of the fracture.Four 7.3 mm ASIS cannulated screws were introduced through stab wounds from the lateral aspect of the proximal femur, past the fracture site into the femoral head. These were done under fluoroscopic control after proper insertion of guide pin, drilling, and measuring. Good reduction of the fracture and good position of the hardware was verified with the C-arm image intensifier. The wounds were irrigated. Subcutaneous tissues were closed with 3-0 Monocryl sutures.  The skin was closed with 4-0 sutures. Ten ml of 0.25% Marcaine were injected in the operative area.  Sterile dressing was applied.  The patient was transferred to a regular bed and transferred to the recovery room in stable condition.

*Defendants' Exhibit B (Medical Records of Randy Lucas - Part 4) - Doc. No. 14-5* at 69.

Radiological images obtained immediately after completion of the surgery indicated that "[t]he fracture of the left hip has been fixed in good position and alignment with four

11

metal screws." *Id*. at 81.

On March 31, 2007, medical personnel at Baptist performed a physical therapy profile on Lucas. *Id*. at 75. On April 1, 2007, Lucas received physical therapy during which the physical therapist assistant adjusted Lucas' crutches to a proper fit and noted that Lucas was "proficient" using the crutches with a properly "adjusted gait." *Id*. Dr. Chung examined Lucas later this same day, deemed him in good condition, and ordered that Lucas be discharged from the hospital the following morning. *Id*. at 76. Dr. Chung ordered that upon release Lucas receive changes of his surgical dressing as needed, and provided Lucas a prescription for Vicodin.

Upon his release from Baptist on April 2, 2007, and return to incarceration, correctional medical personnel placed Lucas in a medical observation ward at the Kilby Correctional Facility. On April 3, 2007, Dr. Robbins conducted a thorough post-operative evaluation of Lucas. *Defendants' Exhibit B (Medical Records of Randy Lucas - Part 4) - Doc. No. 14-5* at 93. Dr. Robbins assessed Lucas' condition as "clinically stable" with "weightbearing as tolerated" and ordered "routine wound care." *Id*. Dr. Robbins scheduled a follow-up examination for Lucas on April 9, 2007. During this examination, Dr. Robbins noted patient "ambulating pretty well. Incisions healing well. OK for discharge from [medical observation] ward. Ortho[pedic] f/u as [scheduled on April 18, 2007]." *Id*. Lucas attended this scheduled surgical follow-up appointment with Dr. Chung.

Lucas thereafter returned to Ventress where he underwent routine examinations and

radiological tests on his left hip/knee.  In addition, medical personnel on several occasions

appointments for Lucas with Dr. Chung for further evaluation of his left hip and knee.

*Defendants' Exhibit B (Medical Records of Randy Lucas - Part 5) - Doc. No. 14-6* at 77-

86.  An x-ray of Lucas' left hip taken at Ventress on May 30, 2007, showed the "deformity

of the left femoral neck ... to be intact.  Four Knowles pins extend through the femoral neck

into the femoral head.  Fracture line is not visible. The hip joint is quite well preserved."

*Id*. at 110.  In addition, on July 9, 2007, an x-ray performed at Ventress showed "evidence

of an old fracture of the left femoral neck with internal fixation.  Compared to the previous

examination, there do not appear to be any significant interval changes." *Id*. at 109.  During

Lucas' appointment with Dr. Chung on July 11, 2007, Dr. Chung noted "[t]here is no

tenderness along the joint lines. Range of motion is 0 to 90 degrees of flexion.  X-rays of

the hip [recently taken at the prison and] brought in today [by the patient] showed that the

bones and hardware remain in satisfactory position....  I suspect he has some osteoarthritis

in the left knee....  As far as the left hip is concerned, he can progressively increase

weightbearing."  *Id*. at 78.

    On July 12, 2007, Dr. Peasant examined Lucas as a follow-up to his free-world

appointment the previous day with Dr. Chung.  *Defendants' Exhibit B (Medical Records

of Randy Lucas - Part 4) - Doc. No. 14-5* at 111.  Lucas advised "he feels better [with] less

pain in [left] hip except when laying for long periods of time on [the] hip." *Id*.  Dr. Peasant

noted Lucas ambulated with a "marked limp" and expressed complaints of "grinding" in

his left knee with associated pain "when moving patella from side to side." *Id.* Dr. Peasant ordered an x-ray of Lucas' left knee.  Upon review of the x-ray, Dr. Peasant observed no abnormalities.  *Id.* On September 12, 2007, medical personnel obtained two radiological views of Lucas' left hip. These x-rays showed the four screws implanted by Dr. Chung "are ... in place. There is deformity in the area of the femoral neck, probably related to the previous fracture." *Defendants' Exhibit B (Medical Records of Randy Lucas - Part 5) - Doc. No. 14-6* at 108.

In addition to numerous x-rays on Lucas' left hip and post-operative referrals to Dr. Chung for additional evaluations, throughout Lucas' confinement at Ventress correctional medical personnel, including Dr. Peasant, performed numerous examinations of Lucas regarding complaints of pain in his left hip and knee.  A thorough review of the medical records evidences health care personnel likewise continually evaluated Lucas with respect to his complaints of hip/knee pain, prescribed various medications for alleviation of pain, and ordered numerous special needs profiles in an effort to address the infirmities associated with his condition.

At some time between February 4, 2008 and June 24, 2008, correctional officials transferred Lucas from Ventress to the Elmore/Staton/Draper Correctional Complex and thereafter to the Bibb Correctional Facility. Subsequently and prior to January 26, 2009, officials transferred Lucas to the Loxley Community Work Center.

X-rays taken of Lucas' left hip at the Staton health care unit on June 26, 2008,

"demonstrate[d] flattening of the humeral head and prior pinning with four hollow orthopedic screws. The joint space is uniform. Alignment is anatomic. Bone density is normal and uniform. There is no degenerative or unusual arthropathy. The adjacent soft tissue planes are normal without radiopaque foreign body." *Defendants' Exhibit B (Medical Records of Randy Lucas - Part 5) - Doc. No. 14-6* at 151. The impression supplied by the x-ray indicated "SATISFACTORY PINNING OF THE LEFT FEMORAL NECK." *Id*. On August 12, 2008, "AP and lateral views of the proximal left femur [taken at the Bibb Correctional Facility] demonstrate for all orthopedic screws fixating the femoral neck. There is no radiographic evidence for infection or loosening of the hardware. The femoral head is deformed from prior slipped capital femoral epiphysis. The joint space is uniform. Bone density is uniform. There is no degenerative or unusual arthropathy. The adjacent soft tissue planes are normal without radiopaque foreign body. There has been no significant interval change since a prior examination dated 6/26/08.... SATISFACTORY PINNING OF THE LEFT FEMORAL NECK...." *Id*. at 99.

Additional x-rays performed on  Lucas' left hip during his incarceration at Loxley on January 26, 2009, again indicated that "[t]he hardware is intact without radiographic evidence for infection or loosening. The joint space is uniform. Alignment is excellent. Bone density is normal and uniform.  There is no degenerative or unusual arthropathy.  The adjacent soft tissue planes are normal without radiopaque foreign body...." *Id*. at 94.  X-rays taken on this date of Lucas' left knee "demonstrate[d] no fracture, dislocation, or

subluxation. There is no joint effusion. Alignment is maintained.  Bone density is uniform.

There is mild degenerative change consistent with age but no unusual athropathy.  The soft

tissue planes are unremarkable without radiopaque foreign body."  *Id*. at 93.

On March 3, 2009, correctional medical personnel at Loxley referred Lucas to Dr.

Charles Wilson, an orthopedic surgeon in Mobile, Alabama, for evaluation.  Dr. Wilson

examined Lucas for complaints of left hip and knee pain.  Dr. Wilson noted that the hip

pain suffered by Lucas was typical of that associated with the use of surgical hardware in

repairing a fracture.  *Defendants' Exhibit B (Medical Records of Randy Lucas - Part 5) -

Doc. No. 14-6* at 7 (left hip pain "symptomatic [of] hardware").  Dr. Wilson recommended

"surgery - removal of screws [from left] hip."  *Id*. Correctional medical personnel approved

this recommendation and Dr. Wilson performed surgery on Lucas in April of 2009 to

remove the four screws from Lucas' left hip.

### C.  Deliberate Indifference

Lucas complains that the defendants acted with deliberate indifference to his hip

injury from "March 20, 2007 thru March 30, 2007." *Complaint - Doc. No. 1* at 2.

Specifically, Lucas alleges that the defendants "denied [him] prompt medical care for a

broken hip bone ... [which] forced [him] to endure excessive pain ... due to a diagnosis that

was unsound." *Id*. at 2-3.  He asserts that the defendants should have referred him for an

x-ray of his hip in a more timely manner. *Id*. at 5.  In addition, Lucas contends that he

continued to suffer pain in the joints of his left hip and knee after undergoing surgery at

16

Baptist on March 30, 2007.  *Id*. at 6.

The defendants deny acting with deliberate indifference to Lucas' medical needs and maintain that they undertook an appropriate course of treatment based on his medical history of LCPD and their evaluation of his condition.  In support of this argument, the defendants assert that medical personnel immediately examined Lucas after he injured his hip, provided medication to alleviate his pain, confined him in the health care unit for observation and thereafter ordered various special needs profiles to ensure limited physical activity.  They contend that the medical records also demonstrate the injury did not worsen during the delay in treatment about which Lucas complains.  The defendants further argue that Lucas received necessary and adequate treatment after completion of surgery.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000);  *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986).  Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (Under *Estelle*, plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled

with a refusal to treat or a delay in [the acknowledged necessary] treatment." *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir.1989).  In order to establish "deliberate indifference to [a] serious medical need ..., Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-1307 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

18

> In articulating the scope of inmates' right to be free from deliberate indifference, ... the Supreme Court has ... emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291; *Mandel,* 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers,* 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that [the] defendants' response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."). Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation.");

*Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient). Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records.  *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

In addition to the above-described elements, when an inmate's deliberate indifference claim relates to a delay in treatment, this court must also consider "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007). In a case alleging that delay in medical treatment shows deliberate indifference, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1187-1188 (11th Cir. 1994), *overruled in part on other grounds*, *Hope v. Pelzer*, 536 U.S. 730, 739 n.9, 122 S.Ct. 2508, 2515 n.9 (2002); *Mann*, 588 F.3d at 1307 (no deliberate indifference to serious medical need where delay did not worsen condition).

Initially, the court notes Lucas presents no verifiable medical evidence which

20

indicates that his hip fracture worsened from the time of the injury on March 20, 2007 until the performance of surgery on March 30, 2007; rather, the evidence before the court, including the medical records of Dr. Chung, demonstrates that Lucas' condition remained unchanged during this short period of time. In addition, the medical records establish that Lucas suffered chronic left hip pain for several years preceding the March 20, 2007, injury; routinely reported problems associated with his left hip prior to this injury; and suffered from a degenerative bone disease in this hip for which he consistently received treatment. At the time of his initial evaluation regarding the March 20, 2007, injury, Dr. Peasant was aware of Lucas' medical history.  Based on his knowledge of this history and a physical examination of Lucas, during which Lucas advised of pain in the left hip and exhibited the ability to flex his hip but with a decreased range motion, Dr. Peasant diagnosed Lucas with a contusion of the left hip joint. Dr. Peasant initiated a treatment plan which included pain management through the use of prescription medication and severe limitation of Lucas' physical activities via issuance of special needs profiles.  Thus, Lucas received immediate medical treatment for his injury in the form of physical examinations, medical evaluations, pain medication, and the issuance of various special needs profiles, including assignment to a bottom bunk, orders for bed rest, prohibition of weight-bearing activities and limitations on standing and walking. When Lucas' physical condition did not improve after he followed this treatment regimen for a week, Dr. Peasant referred him to an outside orthopedist for evaluation and treatment.

Under the circumstances of this case, it is clear the course of treatment undertaken by the defendants in addressing the injury to Lucas' left hip did not violate his constitutional rights. The medical care that Lucas received was adequate and certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. Although Lucas challenges the initial diagnoses and treatment decisions rendered by medical personnel with respect to his hip injury suffered on March 20, 2007, alleges he should have received an x-ray of his hip sooner than March 27, 2007, and attacks the propriety of post-operative treatment provided for hip pain, these assertions, without more, fail to establish deliberate indifference. *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545-1546 (Whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability. In addition, inmate's allegation prison physician did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'... to the level of deliberate indifference."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that Lucas received medical treatment for each of his asserted complaints and clear that the defendants rendered treatment to Lucas in accordance with their professional judgment.  Based on well-settled law, Lucas' mere desire for a different mode of medical treatment does not amount to deliberate indifference.  In addition, Lucas has failed to present any evidence which indicates that the defendants knew that the manner in which they provided treatment created a substantial risk to his health and that with this knowledge consciously disregarded such risk.  The record is therefore devoid of evidence, significantly probative or otherwise, showing the defendants acted with deliberate indifference to Lucas' medical conditions.  Consequently, summary judgment is due to be granted in favor of the defendants.  *Carter*, 352 F.3d at 1350.

### IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before March 7, 2012, the parties may file objections to this Recommendation.  Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general

23

objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 22nd day of March, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE